Ordered in the Southern District of Florida on April 21, 2009.

*A. Jay Cristol*

A. Jay Cristol, Chief Judge Emeritus
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

In re:                                                    Case No. 04-13319-BKC-AJC

JEFF TUCKER,                                    Chapter 7

      Debtor.
_____/

**MEMORANDUM ORDER GRANTING MOTION TO ENFORCE TERMS OF
STIPULATION OF CONTROVERSY [D.E. 331]**

THIS CAUSE came before the Court for an evidentiary hearing on March 18, 2009 to consider Joel L. Israel's, as trustee for the Joel L. Israel Revocable Trust (*"JRT"*) Motion to Enforce Terms of Stipulation of Controversy [D.E. 331] ("*Motion to Enforce*"), and the Debtor's Response [D.E. 357]. Having reviewed the Motion to Enforce and the Response and considering the evidence admitted into the record and the arguments of counsel, the Court finds as follows:

1

## BACKGROUND

*A. The Debtor's Bankruptcy Filing*

1. On April 16, 2004, the Debtor filed a voluntary petition under chapter 7 of the bankruptcy code. Barry E. Mukamal was appointed chapter 7 trustee.

2. The Debtor's "schedules" listed *de minimis* assets, all of which were claimed to be exempt. These assets included a home located at 3241 Florida Avenue, Miami, Florida ("***Florida Property***").

3. The Debtor claimed that the Florida Property was his homestead.

4. The Debtor's schedules also included a judgment entered against him in the amount of $405,000 ("***Judgment***"). The then holder of the Judgment was Turkey Creek Limited Liability Company ("***Turkey Creek***").

5. The basis of the Judgment was the Debtor's filing of four hundred and five false deeds against real property in Colorado. The state court in Colorado imposed the maximum monetary fine against the Debtor in connection with the entry of the Judgment pursuant to its spurious recordings statute.

6. On August 13, 2004, Turkey Creek commenced an adversary proceeding ("***Adversary Proceeding***") against the Debtor.[1] The purpose of the Adversary Proceeding was to seek a ruling from this Court that the Judgment was non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6) of the Bankruptcy Code.

7. During the pendency of the Adversary Proceeding, Turkey Creek assigned the Judgment to Ginn Battle Lender, LLC ("***Ginn Battle***").

---

[1]Adv. Case No. 04-1411-BKC-AJC-A.

8.     On March 10, 2006, the Court entered its Agreed Final Judgment of Nondischargeability [D.E. 80] in the Adversary Proceeding.

9.     Joel L. Israel subsequently purchased the Judgment from Ginn Battle for $500,000. Mr. Israel subsequently assigned the Judgment to JRT, which is the current holder of the Judgment.

### B. *The Debtor's Settlement with the Trustee*

10.    On December 8, 2006, the Trustee filed his Motion to Approve Stipulation of Controversy [D.E. 211] ("***Settlement Motion***"). The Settlement Motion attempted to settle the multiple claims the Trustee held against the Debtor.

11.    Attached to the Settlement Motion was a stipulation of controversy executed by the Debtor ("***Stipulation***").

12.    The thrust of the Stipulation was set forth in paragraph 1.b:

> Debtor - through family and friends - shall tender and otherwise turnover and assign (at the option of the Trustee) real property interests to the Trustee which must deliver no less than the net amount of $700,000 (Settlement Amount) above and beyond all liens, interests and encumbrances thereon, and after payment of any and all closing costs, brokerage and listing fees, with the requirement that the Settlement Amount be received in its entirety by the Trustee no later than November 30, 2007 (identified by the attached "List").

13.    As set forth in the Stipulation, the Debtor was to pay or cause to be paid, $700,000 by no later than November 30, 2007 ("***Settlement Amount***"). The Debtor further agreed that "[i]t shall be [his] responsibility to ensure that the Trustee received the ultimate Settlement Amount in a timely fashion." *See* Stipulation, ¶ 1.d.

14.    To the extent the Debtor did not fund the Settlement Amount, Paragraph 20 of the Stipulation provided ("***Default Remedy***"):

3

>This Agreement shall run with the land of the Debtor. If there is a default- that is a failure to deliver the Settlement Amount described above-the Debtor's Discharge, if granted, shall be revoked under 11 U.S.C. § 727(a) for failing to comply with the order approving this stipulation. If the discharge is not granted, the discharge may be denied upon ex parte motion with affidavit of default filed by the Trustee; and, the Trustee shall be entitled to title of the homestead of the Debtor as identified in the Debtor's originally filed Scheduled A and C. A Quit Claim Deed by the Debtor or transferring title to the Trustee shall be held in escrow by Robert C. Meyer, P.A. and will only be delivered to the Trustee upon bankruptcy court order. If the proceeds from the homestead (combined with or without the other property sales) satisfies the obligation to the Trustee, then there shall be no revocation or denial of discharge and any excess proceeds will be delivered as described in paragraph 3 above. Said claim may include interest and fees and costs associated with having to file any such enforcement action.

15. Payment of the Settlement Amount was intended to satisfy "all claims, including the Trustee's Adversary and the Trustee's Objection to Exemptions-which the Trustee has or may have against the Debtor derived from these Chapter 7 proceedings." *See* Stipulation, ¶ 1.f. Additionally, "[a]ny payments made by the Trustee to a creditor, whose claim is adjudicated nondischargeable by this Court, shall be deemed a setoff against the amount owed by the Debtor to said Creditor." *See* Stipulation, ¶ 1.h. The Debtor agreed that "the $700,000.00 Settlement Amount should satisfy the allowed claims of the Estate." *See* Stipulation, ¶ 1.i.

16. The Stipulation also provided that "[a]ny payments made by the Trustee to a creditor, whose claim is adjudicated nondischargeable by this Court, shall be deemed a setoff against the amount owed by the Debtor to said Creditor." *See* Stipulation, ¶ 1.h.

17. Finally, the Debtor agreed that:

    a. The Stipulation constituted the entire agreement and understanding between him and the Trustee;

    b.    He received legal counsel of his choice prior to the signing of the Stipulation, that he signed the Stipulation voluntarily after advice from his counsel and that the Stipulation was entered into knowingly and intelligently and of free will; and

    c.    He read each page of the Stipulation, he fully understood the recitations of the Stipulation, and voluntarily signed the Stipulation with such understanding.

18.    The recitals of the Stipulation specifically noted that the holder of the Judgment was an intended beneficiary of the Stipulation:

    a.    WHEREAS, the major creditor (Turkey Creek)-and perhaps only creditor-of this Estate has a pending exception to dischargeability action against the Debtor;

    b.    WHEREAS, the Settlement herein involves payment without any contingency or satisfaction of debt owed by the Debtor to any creditor on notice of this Bankruptcy Case.

19.    The source of the funds for the Settlement Amount was to be from various eminent domain proceedings pending in the United States District Court ("***Proceedings***"). Many of these actions had been pending for several years.

20.    On July 20, 2007, the Court approved the Settlement Motion, overruling the objection being prosecuted by Mr. Israel (the then holder of the Judgment) and entered its Omnibus Agreed Order: (1) Granting Motion to Approve Stipulation of Controversy (CP #211); and (2) Overruling Ginn Battle Lender, LLC's Objection (CP #212) [D.E. 249] ("***Settlement Order***"). The Settlement Order required that the Settlement Amount be paid by July 11, 2008.

21.    The Debtor did not appeal the Settlement Order nor seek to vacate it.

### C. *The Debtor's Post Settlement Activities*

22.     By July 11, 2008, not one dollar was turned over to the Trustee by the Debtor or his family and friends. Instead, the Debtor argued that he needed additional time to procure the funds. This argument was entirely disingenuous since at a prior hearing, counsel for the United States indicated that the total amount of funds subject to the Proceedings was significantly less than $700,000 and furthermore, that counsel for the United States did not believe the Debtor or his family were the proper recipients of the funds subject to the Proceedings.

23.     On December 30, 2008, JRT filed its Motion to Enforce. The Motion to Enforce sought enforcement of the Default Remedy due to the Debtor's failure to fund the Settlement Amount by the required deadline.

24.     On February 20, 2009, the Debtor filed its Response to JRT's Motion. [D.E. 357].

25.     On March 18, 2009, this Court conducted an evidentiary hearing on the Motion.

### **DISCUSSION**

### A. *JRT Has Standing to Prosecute the Motion*

26.     The Debtor initially argues that JRT does not have standing to prosecute the Motion. The basis of this argument appears to be twofold: (1) JRT lacks standing because it (or its immediate predecessor in interest) allegedly acquired the Judgment as a means to harass the Debtor and (2) only the trustee has standing to prosecute the Motion. The Court rejects these arguments.

27.     First, the Court finds that Mr. Israel did not purchase the Judgment as a means to harass the Debtor. During the evidentiary hearing, counsel for the Debtor cross examined Mr. Israel at length, including inquiring in to the reason for his acquisition of the Judgment. Mr. Israel testified:

6

Q: When you purchased -- when you approached Jim [sic] Battle and made this offer of $500,000 to purchase the $405,000 judgment, what analysis did you perform?

A: I didn't approach Jim [sic] Battle. It was a law firm here was representing Jim Battle, and I was talking to one of the attorney's at the firm who at the time was there, who was representing Jim [sic] Battle. And we went over the value of the judgment at the time I bought it. It was bought at a discount on strictly a business deal, and even if wasn't Mr. Tucker, I would have bought the judgment if I had the money. And it was a substantial discount, I thought I could collect. And I know Mr. Tucker is a pretty substantial individual. He tries to hide everything and that's why I bought the judgment, I thought I could collect on it.

Q: Did you perform any analysis with regard to that decision?

A: I don't know what the word analysis means. I'm confused by that word.

Q: Well --

A: It was a discount -- it was very simple, Alan. I looked at the thing, I was told it was worth like 565, I could buy it for 500. That was my analysis.
I knew Jeff Tucker quite well. I knew he's a very substantial person. He hides everything. He's [sic] does a lot of criminal things, and I bought it because I thought I could collect. That's the analysis I did.[2]

28. The Court finds Mr. Israel's testimony on this point credible and the Debtor has presented no evidence to controvert this testimony.

29. Second, the Court finds that JRT has standing to prosecute the Motion.

30. As articulated in the Supreme Court's decision in *Valley Forge Christian College v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982), for a party to have standing: (a) the party must have suffered actual injury or threatened injury; (b) the injury must be fairly traceable to the conduct at issue; and © a demonstration must be made that the requested relief is likely to redress the injury.

31. Here, JRT meets *Valley Forge*'s criteria. If the terms of the Stipulation are not

---

[2] Tr. pp 57-58, March 18, 2009.

7

enforced, JRT will be harmed with such harm being directly traceable to the Debtor's breach of the Stipulation. The financial benefits flowing to JRT from the Stipulation will simply evaporate. Finally, this Court has the authority and jurisdiction to redress such injury as the Stipulation confers exclusive jurisdiction upon it to resolve any controversies with respect to the Stipulation, and a favorable ruling by this Court will directly avoid harm to JRT.

32. Additionally, the Stipulation makes explicitly clear that JRT is an intended beneficiary of the Stipulation and thus, has standing to prosecute the Motion based upon principles of contract law. *See Moyer v. Graham*, 285 So. 2d 397, 402 (Fla. 1973) ("The question of whether a contract was intended for the benefit of a third person is generally regarded as one of construction of the contract. The intention of the parties in this respect is determined by the terms of the contract as a whole, construed in the light of the circumstances under which it was made and the apparent purpose that the parties are trying to accomplish."); *see also In re Spong*, 661 F.2d 6 (2d Cir. 1981) (allowing attorney to file § 523 complaint for legal services rendered to debtor's former spouse in connection with divorce proceeding when debtor agreed to pay such fees pursuant to settlement agreement because attorney was third party beneficiary under contract).

33. As set forth above, the Stipulation is replete with references to the holder of the Judgment and the specific effect the Stipulation and payment of the Settlement Amount will have upon the Judgment:

    a. The recitals provided that "WHEREAS, the major creditor (Turkey Creek)- and perhaps only creditor-of this Estate has a pending exception to dischargeability action against the Debtor;" and "WHEREAS, the Settlement herein involves payment without any contingency or satisfaction of debt owed by the Debtor to any creditor on notice of this Bankruptcy Case."

    b. Any payments made by the Trustee to a creditor, whose claim is adjudicated

> nondischargeable by this Court, shall be deemed a setoff against the amount owed by the Debtor to said Creditor. *See* Stipulation, ¶ 1.h.
>
> c.   The $700,000.00 Settlement Amount should satisfy the allowed claims of the Estate. *See* Stipulation, ¶ 1.i.

34.   Based upon these references to the Judgment, the Court finds that JRT is an intended third party beneficiary of the Stipulation and thus, has standing to enforce its provisions, including the Default Remedy.

### B. *It is Doubtful that the Florida Property is Homestead in the First Instance and Even if Homestead, the Florida Property is Subject to Hypothecation*

35.   The Debtor further argues that the Stipulation is unenforceable on the basis that the Florida Property is his homestead, and thus, not subject to hypothecation.[3] The Court rejects this argument. In sum, this argument is the Debtor's latest iteration to commit a fraud upon this Court, the Trustee and the Debtor's creditors.

36.   The Florida Constitution provides "[t]here shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, the following property owned by a natural person: (1) a homestead . . . . Art. X, § 4(a), *Fla. Const.*

37.   As an initial matter, the factual record does not support the Debtor's claim that the Florida Property is the Debtor's homestead. In particular, the title history of the Florida Property displays the following:

> a.   On May 27, 1994, the Florida Property was conveyed by warranty deed to New City Realty Co. (*"New City"*).[4]

---

[3] In his Response, the Debtor appeared to argue that the Stipulation may be subject to mutual mistake and thus, be unenforceable. However, the Debtor presented no evidence at the hearing to support this claim. As such, it is rejected.

[4] *See* JRT's <u>Exhibit 1</u> admitted into evidence at the March 18th, 2009 hearing.

9

      b.      On November 7, 2000, New City quit claimed the Florida Property to "R T."[5]

      c.      On the same day, "RT" quit claimed the Florida Property to Dawal Farms Co., Inc. (*"Dawal"*).[6]

38.    Based on the above, it appears that Dawal is the title holder of the Florida Property.

39.    Furthermore, although not dispositive, the tax records for the Florida Property reflects that it has no taxable homestead exemption.[7] The tax records reflect that New City is the owner of the Florida Property.

40.    To support his purported homestead claim, the Debtor admitted into evidence a deed purportedly showing that he was title holder to the Florida Property.[8] This deed reflects a conveyance from Dawal to "J T" on November 4, 2000.

41.    The Court finds this evidence to be unpersuasive and more likely, just another instance of the Debtor's attempt to convolute true ownership of real property. Importantly, the property allegedly conveyed in this deed contains a legal description completely distinct from that of the Florida Property.

42.    Based upon the properly recorded title history introduced into evidence, the Florida Property is held by a corporation. As such, it cannot be considered homestead. *See In re Duque*, 33 B.R. 201 (Bankr. S.D.Fla. 1983) (denying homestead exemption where property held by

---

[5] *See* JRT's Exhibit 3 admitted into evidence at the March 18th, 2009 hearing.

[6] *See* JRT's Exhibit 2 admitted into evidence at the March 18th, 2009 hearing.

[7] *See* JRT's Exhibit 4 admitted into evidence at the March 18th, 2009 hearing

[8] Outside of this deed, the Debtor introduced no other evidence to support his claim that the Florida Property was his homestead. Notably, the Debtor was absent at the March 18th evidentiary hearing.

10

corporation).

43.     Moreover, even if the Florida Property is the Debtor's homestead, the Court finds that the Debtor voluntarily hypothecated the Florida Property per the terms of the Stipulation.

44.     Here, the terms of the Stipulation make explicitly clear that the Debtor voluntarily hypothecated the Florida Property. As such, the Debtor's argument that the Default Remedy is unenforceable fails. In particular, the Default Remedy provides "the Trustee shall be entitled to title of the homestead of the Debtor" and "A Quit Claim Deed by the Debtor or transferring title to the Trustee shall be held in escrow by Robert C. Meyer, P.A." The terms of the Stipulation also make clear that the Debtor knowingly and voluntarily agreed to this hypothecation of the Florida Property.[9]

## CONCLUSION

45.     After nearly five years before the Court, this Debtor has made no effort to pay his creditors and earn the "fresh start" that honest, yet hard pressed debtors are entitled to receive. Instead, the Debtor has engaged in a game of obfuscation and delay. This game and by extension, the abuse of the jurisdiction of this Court, will not be tolerated.

46.     The Debtor tries to paint Joel Israel, trustee for JRT, with bad faith as a defense to standing and enforcement of the settlement agreement. However, nothing could be further from the truth. Mr. Israel was straightforward on cross-examination; and, while the Court may not understand

---

[9]The Debtor also argues the Default Remedy is unenforceable pursuant to *Chames v. DeMayo*, 972 So. 2d 850, 853 (Fla. 2007). The Court finds that decision inapplicable here. In particular, *Chames* answered the question of whether a person could voluntarily *waive* his homestead exemption in an unsecured agreement in the event he failed to pay his attorney's fees. The court answered the question in the negative. Here, the Debtor voluntarily *conveyed* his interest in the Florida Property as part of the Stipulation, thus making *Chames* factually inapposite.

11

why Mr. Israel purchased the subject judgment, that is not bad faith nor is it determinative of the issues before the Court. The ultimate issue before the Court is standing, and bad faith is no defense to that.

47.    The Court determines that JRT has standing to prosecute the Motion. And, even if the Florida Property is the Debtor's homestead, which based upon the admitted evidence it appears that it is not, the Debtor voluntarily hypothecated the Florida Property per the terms of the Stipulation. Thus, it is - -

**ORDERED AND ADJUDGED** as follows:

1.    The Motion to Enforce Terms of Stipulation of Controversy [D.E. 331] is GRANTED and the Florida Property shall be transferred to the Trustee within ten days after entry of this Order. The legal description of the Florida Property is as follows:

> FROW HOMESTEAD PB B-106
> LOT 11 BLK 20
> LOT SIZE 50.000 X 100
> OR 16399-4631 0594 4

If the Debtor fails to transfer the Florida Property to the Trustee, the Court will consider contempt proceedings against the Debtor on an emergency basis to ensure compliance with this Order.

2.    Prior to transferring the Florida Property to the Trustee as required by this Order, the Debtor shall not hypothecate, transfer or convey the Florida Property to any other person or entity (other than the Trustee) nor shall the Debtor encumber the Florida Property.

3.    The Court reserves ruling with respect to the Debtor's discharge, pending the filing of a separate motion and affidavit.

###

**Submitted By:**

Jonathan S. Feldman, Esq.
Florida Bar No. 12682
jfeldman@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
3000 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-6363
Telecopy: (305) 358-1221

Copies Furnished to:
Jonathan S. Feldman, Esquire is directed to serve copies of this order on all interested parties and to file a certificate of service.